IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| JOSEPH KEITH THOMAS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO. 2:14cv1119-CSC |
| | ) | (WO) |
| CAROLYN W. COLVIN, | ) | |
| Acting Commissioner of Social Security,[1] | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION**

**I. Introduction**

Plaintiff Joseph Keith Thomas ("Thomas") applied for disability insurance benefits pursuant to Title II of the Social Security Act, 42 U.S.C. §§ 401 et seq., and for supplemental security income benefits under Title XVI of the Social Security Act, 42 U.S.C. § 1381 et seq., alleging that he was unable to work because of a disability. His application was denied at the initial administrative level. The plaintiff then requested and received a hearing before an Administrative Law Judge ("ALJ"). Following the hearing, the ALJ also denied the claim. The Appeals Council rejected a subsequent request for review. The ALJ's decision consequently became the final decision of the Commissioner of Social Security (Commissioner).[2] *See Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986). The case is

---

[1] Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14, 2013.

[2] Pursuant to the Social Security Independence and Program Improvements Act of 1994, Pub.L. No. 103-296, 108 Stat. 1464, the functions of the Secretary of Health and Human Services with respect to Social Security matters were transferred to the Commissioner of Social Security.

now before the court for review pursuant to 42 U.S.C. §§ 405 (g) and 1631(c)(3). Pursuant to 28 U.S.C. § 636(c)(1) and M.D. Ala. LR 73.1, the parties have consented to the United States Magistrate Judge conducting all proceedings in this case and ordering the entry of final judgment. Based on the court's review of the record in this case and the briefs of the parties, the court concludes that the decision of the Commissioner should be reversed and this case remanded to the Commissioner for further proceedings.

## II.  Standard of Review

Under 42 U.S.C. § 423(d)(1)(A), a person is entitled to disability benefits when the person is unable to

> engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . .

To make this determination,[3] the Commissioner employs a five-step, sequential evaluation process.  *See* 20 C.F.R. §§ 404.1520, 416.920.

> (1) Is the person presently unemployed?
> (2) Is the person's impairment severe?
> (3)  Does the person's impairment meet or equal one of the specific impairments set forth in 20 C.F.R. Pt. 404, Subpt. P, App. 1?
> (4) Is the person unable to perform his or her former occupation?
> (5) Is the person unable to perform any other work within the economy?

> An affirmative answer to any of the above questions leads either to the next question, or, on steps three and five, to a finding of disability.  A negative

---

[3]  A "physical or mental impairment" is one resulting from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques.

answer to any question, other than step three, leads to a determination of "not disabled."

*McDaniel v. Bowen*, 800 F.2d 1026, 1030 (11th Cir. 1986).[4]

The standard of review of the Commissioner's decision is a limited one. This court must find the Commissioner's decision conclusive if it is supported by substantial evidence. 42 U.S.C. § 405(g); *Graham v. Apfel*, 129 F.3d 1420, 1422 (11th Cir. 1997). "Substantial evidence is more than a scintilla, but less than a preponderance. It is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). A reviewing court may not look only to those parts of the record which support the decision of the ALJ but instead must view the record in its entirety and take account of evidence which detracts from the evidence relied on by the ALJ. *Hillsman v. Bowen*, 804 F.2d 1179 (11th Cir. 1986).

> [The court must] . . . scrutinize the record in its entirety to determine the reasonableness of the [Commissioner's] . . . factual findings . . . No similar presumption of validity attaches to the [Commissioner's] . . . legal conclusions, including determination of the proper standards to be applied in evaluating claims.

*Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987).

### III.  The Issues

**A. Introduction.**  Thomas was 37 years old at the time of the hearing before the ALJ and has a general equivalency degree ("GED"). (R. 33). His prior work experience includes

---

[4] *McDaniel v. Bowen*, 800 F.2d 1026 (11th Cir. 1986) is a supplemental security income case (SSI). The same sequence applies to disability insurance benefits. Cases arising under Title II are appropriately cited as authority in Title XVI cases. *See e.g. Ware v. Schweiker*, 651 F.2d 408 (5th Cir. 1981) (Unit A).

work as an automobile mechanic, a switch tender and a coupler.  (R. 21).  Following the

administrative hearing, the ALJ concluded that Thomas has severe impairments of

> bipolar disorder mixed with psychosis and paranoia; major depressive disorder,
> recurrent; generalized anxiety disorder; post-traumatic stress disorder, chronic;
> personality disorder with borderline traits; identity disorder; history of drug
> abuse (not material); largely distant history of bronchitis, sinusitis, allergic
> rhinitis, gastroesophageal reflux disease, insomnia, and nicotine addiction; low
> back pain with negative lumbosacral spine x-rays; and tendonitis.

(R. 13).

The ALJ concluded that Thomas was unable to perform his past relevant work but,

using the Medical-Vocational Guidelines, 20 C.F.R. Pt. 404, Subpt. P., App. 2, as a

framework and relying on the testimony of a vocational expert, he concluded that there were

significant number of jobs in the national economy that the plaintiff could perform.  (R. 21-

22).  Accordingly, the ALJ concluded that the plaintiff was not disabled.  (R. 22-23).

**B. Plaintiff's Claim**.  The plaintiff presents a single issue for the Court's review.  As

stated by the plaintiff, "[t]he ALJ failed to properly evaluate the opinion of the State Agency

consultative examiner."  (Doc. # 12, Pl's Br. at 4 & 9).  According to the plaintiff, the ALJ

failed to give proper weight to the opinion of the consultative psychologist, Dr. Marnie

Dillon, and he improperly relied on the opinion of the non-examining state agency physician.

(*Id*. at 11).

## IV.  Discussion

This court's ultimate inquiry is whether the Commissioner's disability decision is

supported by the proper legal standards and by substantial evidence.  *See Bridges v. Bowen*,

815 F.2d 622 (11th Cir. 1987). An administrative law judge has a duty to develop a full and fair record. *Ellison v. Barnhart*, 355 F.3d 1272, 1276 (11th Cir. 2003); *Kelley v. Heckler,* 761 F.2d 1538 (11th Cir. 1985). The ALJ is not free to simply ignore medical evidence, nor may he pick and choose between the records selecting those portions which support his ultimate conclusion without articulating specific, well supported reasons for crediting some evidence while discrediting other evidence. *Marbury v. Sullivan*, 957 F.2d 837, 839-41 (11th Cir. 1992). When there is a conflict, inconsistency or ambiguity in the record, the ALJ has an obligation to resolve the conflict, giving specific reasons supported by the evidence as to why he accepted or rejected one opinion or record over another.

As will be explained, there are a myriad of problems with this case. First, the ALJ improperly gave substantial weight to the opinion of a non-examining physician, Dr. Robert Estock. Next, in assessing weight given to the medical opinions, he improperly equated the opinion of Dr. Estock, the non-examining physician, to the opinion of the examining, consultative psychologist, Dr. Marnie Dillon. He then compounded his errors by failing to state with sufficient particularity the reasons for the weight he gave to Dr. Dillon's opinions. Further, he selectively culled the record for entries that supported his conclusions and in so doing, he failed to reconcile inconsistencies and ambiguities in the medical record and between Dr. Estock and Dr. Dillon's opinions regarding Thomas' abilities to interact with supervisors, co-workers and the public in a work setting. Finally, the ALJ ignored the limitations and effects of Thomas' self-mutilation impairment on his ability to perform work.

5

The medical evidence in this case demonstrates that Thomas suffers from bipolar disorder, severe recurrent depression and borderline personality disorder.  As early as 2001, Thomas was diagnosed with depression and placed on medication.  (R. 345).  In 2002, he was diagnosed with anxiety and self-mutilation, referred to a psychiatrist and placed on Ativan. (R. 343).  On October 20, 2005, Thomas presented to the Elmore County Rural Health Clinic complaining of anxiety, panic attacks, paranoia and mood swings.  (R. 329).  He was prescribed Klonopin.  (*Id.*)  On January 4, 2007, Thomas presented to the health clinic because his "bipolar disorder [was] acting up."  (R. 327).  He was continued on Klonopin.  (R. 327).  On November 6, 2008, Thomas was placed on Depakote to treat his bipolar disorder.  (R.341).  On March 24, 2009, Thomas reported that his medications of Xanax and Klonopin were no longer working. (R. 323).  He was started on Prozac and Seroquil.  (*Id.*)

On July 13, 2009, Thomas' wife took him to the Jackson Hospital emergency room because "its just been getting worse."  (R. 258).  Thomas was depressed and had attempted suicide three times within the past week.[5] (R. 258-59, 267).  At that time, Thomas reported cutting and burning himself since he was ten (10) years old.  (R. 259).  Treatment notes reflect that "[d]ue to active suicidal ideations, recommend inpatient for stabilization."  (*Id.*).  Thomas was transferred to East Alabama Medical Center by court order.  (R. 237-42).  He

---

[5] He twice attempted suicide by overdosing on Prozac and Klonopin and once he slit his wrists.  (R. 258).

remained hospitalized from July 14, 2009 until July 20, 2009. (*Id.*). He was diagnosed with Depressive Disorder, Bipolar Disorder and history of suicidal ideation. (R. 265). It was noted that Thomas' condition was a chronic problem. (R. 260).

On July 31, 2009, Thomas presented to Montgomery Area Mental Health for follow up care. He was diagnosed with Bipolar Disorder, Major Depressive Disorder, recurrent without psychotic features, Depression and Self-Mutilation. (R. 396-99). He was prescribed Efflexor and Remeron for depression. (R. 400).

On February 16, 2010, Thomas presented to the Jackson Hospital emergency room with suicidal thoughts, anxiety, hallucinations, and depression. (R. 245). His affect was flat. He was tearful and anxious. (*Id.*) He had suicidal ideations with a plan. (*Id.*) The hospital obtained an emergency hold order from the probate court. (R. 246). He was discharged on February 17, 2010 with benzodiazepines and major tranquilizers. (R. 252).

On September 27, 2010, Thomas was taken by ambulance to the Jackson Hospital emergency room because he had cut his wrists. (R. 272). He was suicidal with a history of "self cutting when he gets upset." (*Id.*) He declined admission and was discharged with a diagnosis of Non-Psychotic Disorder.[6] (R. 269-70).

On October 4, 2010, Thomas returned to the Elmore County Rural Health Clinic because of his self inflicted lacerations. He was prescribed Efflexor and Depakote and advised to follow up with mental health treatment for his bipolar disorder and self-mutilation.

---

[6] His medical chart also noted his bipolar diagnosis. (R. 272).

7

(R. 367).

On October 11, 2010, Thomas presented to Baptist Health complaining of depression and paranoia. (R. 378). He was agitated and afraid he would hurt himself. (R. 383). Thomas presented to Montgomery Mental Health on October 21, 2010 because his employer required him to seek psychiatric care and he wanted "to be emotionally stable to keep his job." (R. 391-92, 411). Thomas was suspicious, paranoid, depressed, agitated, irritable, and unable to sleep. (R. 411). He had decreased ability to think, racing thoughts, and was engaged in high risk behaviors. (*Id*.) He was diagnosed with bipolar mixed psychosis, history of depression and self-mutilation. (R. 392). He was prescribed Efflexor, Xanax and Depakote. (R. 400).

On November 17, 2010, Thomas' treatment notes indicated that he was suicidal; he had been cutting himself since he was nine (9) years old; and he had been abused at ages nine (9) and fifteen (15). (R. 409). He was treated for bipolar disorder with Efflexor, Depakote and Xanax. (R. 408). On November 29, 2010, Thomas arrived at therapy disheveled but reported that he had not cut himself for three (3) days. (R. 407).

On March 31, 2011, Thomas was referred to Baptist Health for a mental evaluation. (R. 369-85; 453-83). At that time, he was suicidal, depressed, and hallucinating. (R. 374, 459).

On May 11, 2011, Thomas presented to Montgomery Area Mental Health reporting that he had "recently been discharged from PAC" which had changed his medications. (R.

405). He was now taking Haldol and Tegretol, and he had not cut himself for several weeks. (*Id*.) On June 9, 2011, he reported that he had not cut himself for seven (7) weeks, but he was suffering side effects from the Haldol medication. (R. 401-03). He still reported mood swings. His insight was described as fair. (R. 401). His Tegretol was increased, his Haldol was decreased, and he was started on Cogentin. (*Id*.)

On September 2, 2011, Thomas was anxious and had increased paranoia regarding his medication. (R. 488). He was agitated, had difficulty concentrating and was cutting himself again. (*Id*.) On September 8, 2011, it was noted that Thomas was suffering from increased paranoia. (R. 487). On September 20, 2011, he reported suffering panic attacks. (R. 486).

On November 4, 2011, Thomas was suffering from audio hallucinations and had a depressed mood. (R. 482). He was also cutting himself again. (*Id*.)

On December 6, 2011, Thomas reported more stable moods and had only had one (1) episode of cutting. (R. 481). On December 8, 2011, it was noted that Thomas has an existing diagnosis of bipolar disorder with psychotic features, depression and self-mutilation. (R. 490). He reported the audio hallucinations were "better" and he received a refill of his medications. (R. 480).

On March 8, 2012, Thomas stated that he was "doing well on his current psychotropic meds." (R. 477). His psychiatrist noted that his insight and judgment were fair. His current medications included Risperdal, Tegretol, Haldol, and Cogentin. (*Id*.).

On May 24, 2012, Thomas again reported he was doing well but his psychiatrist noted

that his judgment was impaired.  (R.475).  His medications included Vistaril, Tegretol, Haldol, Cogentin and Risperdal. (*Id*.)

On August 9, 2012, Thomas reported paranoia, particularly about his girlfriend.  (R. 474).  On August 30, 2012, Thomas stated to his psychiatrist that he was "doing well overall . . . except that, he does not want to take Vistaril.  States Vistaril is not working for him.  Pt. wants some other anti-anxiety medication instead of Vistaril. Also, stated, he is having little more of mood swings. Wants his Tegretol dose increased." (R. 473).  His psychiatrist noted that Thomas was "doing fair clinically."  (*Id.*).  His insight was poor and his judgment was impaired.  (*Id*.).  Thomas' Tegretol prescription was increased, and he was continued on Buspar, Haldol, Cogentin, and Risperdal.  (*Id*.)

On October 5, 2012, Thomas was anxious and unable to drive.  (R. 471).  He also reported his tendency to cut and burn himself.  (*Id*.)

On June 28, 2011, Dr. Robert Estock, a reviewing, non-examining physician, opined that Thomas suffers from an affective disorder in Listing 12.04.  (R. 425-441).  Interestingly, while Dr. Estock noted that Thomas suffered from depressive mood symptoms, he did not mark that Thomas had thoughts of suicide, despite the numerous references in the medical evidence to suicide ideations and attempts.  (R. 428).  Dr. Estock suggested that Thomas' functional limitations were no greater than moderate and that he had only one or two episodes of decompensation.  (R. 435). After listing seven medical records that included four (4) references to suicide ideations and thoughts, and a hospitalization for "depression with

10

suicide attempts," Dr. Estock noted that "[h]is most recent therapy notes no SI thoughts, and with meds and treatment seems to be on the road to recovery." (R.437). Dr. Estock completed a residual functional capacity assessment that indicated Thomas was not significantly limited or only moderately limited in his ability to work. (R.439-40). He found Thomas had no significant limitation in sustained concentration and persistence and that he was moderately limited in his ability to respond to supervisors and get along with the public and co-workers. (R. 440).

Almost a year later, on May 30, 2012, Thomas underwent a psychological evaluation by Dr. Marnie Dillion, a licensed clinical psychologist. (R. 444-51). Dr. Dillon noted that Thomas "had visible scars on his forearms, evident through dark tattoos, from past cutting." (R. 444). Thomas "appeared nervous, rocked, and cried at times during the questioning. He remained polite and compliant during the process, but did require frequent "breaks" in order to compose himself." (*Id*.) Thomas reported four hospitalizations and outpatient treatment and medication management through Mental Health. (R. 446). Based on the nature of his childhood abuse, Dr. Dillon opined that Thomas was suffering from Generalized Anxiety Disorder "more likely due to unresolved PTSD [Post Traumatic Stress Disorder]." (*Id*.)

She also diagnosed Thomas as suffering from "Major Depressive Disorder, Recurrent, Severe." (R. 447). "In addition to primary symptoms of anxiety and depression, Mr. Thomas also has long-standing personality issues that likely interfere with his social relationships and daily functioning." (R. 447).

11

> Relationship issues tend to trigger episodes of self-harm, including cutting and suicidal gestures.  Mr. Thomas also has a long history of impulsivity and lawbreaking.  He reported that he currently attempts to "fight those feelings."  He endorsed his last episode of suicidal ideation about one month ago, at which point he engaged in some cutting behavior.  A diagnosis of Borderline Personality Disorder is assigned.

(*Id.*).

Dr. Dillon noted that Thomas' mood was anxious, and he reported feelings of paranoia and hypervigiliance.  (*Id.*)  She noted that his "insight, judgment and decision making abilities are grossly intact, yet impaired during brief periods of impulsivity." (*Id.*)  Finally, Dr. Dillon opined that while Thomas was "*mildly impaired* in his ability to understand, remember and carry out simple and complex instructions," he was *significantly impaired* in his ability to respond appropriately to supervision, co-workers, and work pressure in a work setting due to long-standing personality issues, depression, and anxiety."  (R. 448)(emphasis in original).  Dr. Dillon concluded that Thomas had marked limitations in his ability to interact appropriately in the work place.  (R. 450-51).

The ALJ gave "great weight" to Dr. Estock, concluding that Thomas did not meet Listing 12.04.  Relying solely on Dr. Estock's opinion, the ALJ then determined that Thomas has the residual functional capacity to

> perform medium work as defined in 20 CFR 404.1567(c) and 416.967(c).  Mentally, the claimant is able to understand and remember simple instructions but not detailed ones, could carry out simple instructions and sustain attention to routine/familiar tasks for extended periods, and could tolerate ordinary work pressures but should avoid quick decision-making, rapid changes, and multiple demands.  The claimant would benefit from regular rest breaks and a slower pace but will still be able to maintain a work-pace consistent with the mental

demands of competitive level work.  The claimant's contact with the public should be casual and feedback should be supportive.  Finally, the claimant could adapt to infrequent, well-explained changes (Exhibit 10F Dr. Estock).

(R.15).

In determining Thomas' residual functional capacity, and giving great weight to the opinion of Dr. Estock, the non-examining physician, the ALJ erred in relying on Dr. Estock's opinion.  First, there is nothing in the record indicating Dr. Estock's qualifications or expertise in the area of mental health.  Next, the law is clear that the opinion of a non-examining physician "is entitled to little weight and taken alone does not constitute substantial evidence to support an administrative decision."  *Swindle v. Sullivan,* 914 F.2d 222, 226 (11th Cir. 1990).  *See also Lamb v. Bowen*, 847 F.2d 698, 703 (11th Cir. 1988); *Broughton v. Heckler,* 776 F.2d 960, 962 (11th Cir. 1985).  Nonetheless, in the ALJ's hypothetical questions to the vocational expert, the ALJ simply parrots Dr. Estock's assessment.  Thus, the vocational expert's testimony and conclusions are completely dependent on Dr. Estock's assessment of Thomas' residual functional capacity.  (R. 56-58).  Because a non-examining physician's assessment is entitled to little weight, and cannot constitute substantial evidence to support the ALJ's decision, the  ALJ's reliance on Dr. Estock's assessment was erroneous and his residual functional capacity  is not based on substantial evidence.

After setting forth his residual functional capacity conclusion, the ALJ launches into a description of the medical evidence of record.  (R. at 15-18).  After reciting all the medical

evidence, and finding the plaintiff's statements "not entirely credible," the ALJ says this:

> I did not make a specific finding of fact about using the terms mild, moderate, moderately severe, marked or extreme to describe the RFC. Although not at all essential to the decision, I do note that the psychological professionals in this case have used them on RFC forms, in this as in most cases provided to them by this agency, that these assessments are substantially credible, that the definitions of those terms are stated on the one of the RFC forms and that the vocational expert found that on the basis of the assessments in full (Exhibits 10F, 11F) that the claimant can perform those same jobs existing in significant numbers in the national economy that we find that the claimant can perform. Dr. Dillon's assessment is accorded some weight in her assessment of the claimant's mental capacity and the vocational expert did find that the stated jobs are still available even with her assessment.

(R. 20).

The problem for the court is that, beyond the recitation of some of the medical evidence, the ALJ wholly failed to articulate what he meant by according Dr. Dillon's assessment "some weight." It is not at all clear what the ALJ meant by "some weight," nor can the court determine to which parts of Dr. Dillon's opinion the ALJ accorded some weight. Without explaining what specific evidence the ALJ relies on, what weight the ALJ gives the evidence and why he relies on some evidence but not other evidence, the court is unable to determine what "some weight" means with regards to Dr. Dillon's assessment. It has long been the law of this circuit that an ALJ must state with particularity the weight given to different medical evidence and the reasons therefor. *Sharfarz v. Bowen*, 825 F.2d 278, 279 (11th Cir. 1987). Without an explanation of the weight accorded by the ALJ to the various medical opinions and evidence, it is impossible for a reviewing court to determine whether the ultimate decision on the merits of the claim is rational and supported by substantial

14

evidence.  *Id.*  Furthermore, it is clear that although the ALJ purported to give Dr. Dillon's assessment "some weight," he relied strictly on Dr. Estock's opinion in determining Thomas' residual functional capacity which the court has previously concluded was erroneous.  It is the responsibility of the ALJ to conduct the appropriate legal analysis, and his written decision must include sufficient reasoning to permit the court to determine that he has done so.  In this case, the ALJ's analysis is simply deficient as a matter of law.

It was also error for the ALJ to equate the opinions of Dr. Estock, the non-examining physician, and Dr. Dillon, the examining physician.  An examining physician's opinion is "given more weight than [a] non-examining" physician.  *See Davis v. Barnhart*, 186 F. App'x 965, 967 (11th Cir. 2006).  Thus, the ALJ erred as a matter of law when he gave great weight to the opinion of Dr. Estock, a non-examining physician who did not see Thomas, and only gave "some weight" to the opinion of Dr. Dillon, the consultative psychologist who did examine him.

The ALJ then compounded his errors by selectively culling the record for evidence to support his determination that Thomas is not disabled, and in doing so, failed to reconcile inconsistencies and ambiguities in the medical record and between Dr. Estock and Dr. Dillon's opinions regarding Thomas' abilities to interact in a work setting with supervisors, co-workers and the public.  For example, the ALJ determined that Thomas' severe mental impairments were not disabling because "since acquiring consistent treatment at Mental

15

Health, [Thomas] has steadily improved."[7]   (R. 19).   The ALJ hones in on Thomas'
statements in therapy that he "is doing well on his medications," but ignores Thomas' reports
of self-cutting in September, November and December, 2011.  (R. 488, 481-82).  The ALJ
also ignores Thomas' reports of mood swings (R. 401), panic attacks (R. 486) and anxiety.
(R. 471).   More importantly, the ALJ ignores treatment notes that indicate that
notwithstanding Thomas' opinion of how well he is doing, his psychiatrist determined that
in May 2012 and August 2012, Thomas' judgment was impaired and his insight was poor.
(R. 475, 473).  To say the least, it is odd that the ALJ would credit the self-evaluation of a
person whose judgment and insight is impaired.  The ALJ picked through the medical records
and chose those entries that supported his position.  That was erroneous.

In addition, the ALJ failed to reconcile the inconsistencies between the opinions of
Dr. Estock and Dr. Dillon regarding Thomas' abilities to interact with others in the
workplace.  Based solely on a review of medical records, Dr. Estock found Thomas had no
significant limitation in sustained concentration and persistence and that he was moderately
limited in his ability to respond to supervisors and get along with the public and co-workers.
(R. 440).  Dr. Dillon, on the other hand, concluded that Thomas was *significantly impaired*
in his ability to respond appropriately to supervision, co-workers, and work pressure in a
work setting due to long-standing personality issues, depression, and anxiety."  (R. 448)
(emphasis in original).  Dr. Dillon also concluded that Thomas had marked limitations in his

---

[7]  Ironically, the ALJ finds Thomas' statements regarding the intensity, persistence and limiting effects of his symptoms "not entirely credible" based on his sporadic treatment.  (R.18-19).

ability to interact appropriately in the work place.  (R. 450-51).  The ALJ's residual functional capacity does not address any limitations on Thomas' ability to interact with supervisors or co-workers and merely suggests that his "contact with the public should be casual and feedback should be supportive." (R. 15).  The law does not necessarily require the ALJ to accept the validity of Dr. Dillon's opinion that Thomas is markedly limited in his ability to interact with others appropriately in the workplace, but it *does* require that, in determining Thomas' residual functional capacity, the ALJ must consider *all* the relevant evidence in the case record, and he must specifically state "good cause" for rejecting the medical opinions of an examining physician, particularly a specialist within the area of her expertise. At the very least, the ALJ was required to reconcile the differing opinions concerning Thomas's limitations regarding his abilities to appropriately interact in a work setting.  This is especially important when discussing chronic mental impairments.  The Commissioner recognizes the need to consider the history of the person's illness and how an individual may be managing their home environment in contrast to their ability to function in a work environment.

> For instance, if you have chronic organic, psychotic, and affective disorders, you may commonly have your life structured in such a way as to minimize your stress and reduce your symptoms and signs.  In such a case,  you may be much more impaired for work than your symptoms and signs would indicate. The results of a single examination may not adequately describe your sustained ability to function.   It is, therefore, vital that we review all pertinent information relative to your condition, especially at times of stress.

20 C.F.R. Pt. 220, App. 1.  Listing 12.00E, MENTAL DISORDERS, *Chronic mental impairments*.

17

"[I]t is the responsibility of the Secretary and not the courts to reconcile inconsistencies in the medical evidence, . . . ." *Seacrist v. Weinberger*, 538 F.2d 1054, 1056-57 (4th Cir. 1976). *See also, Gastineau v. Mathews*, 577 F.2d 356, 358 (6th Cir. 1978) ("It is not the function of this Court to resolve conflicts in the medical evidence, but rather it is the function of the Secretary, whose expertise is given great deference."). When there is a conflict, inconsistency or ambiguity in the record, the ALJ has an obligation to resolve the conflict, giving specific reasons supported by the evidence as to why he accepted or rejected one opinion over another. "In the absence of such a statement, it is impossible for a reviewing court to determine whether the ultimate decision on the merits is rational and supported by substantial evidence." *Cowart v. Schweiker,* 662 F.2d 731, 735 (11th Cir. 1981). "Failure to do so requires the case be vacated and remanded for the proper consideration." *Hudson v. Heckler,* 755 F.2d 781, 785 (11th Cir. 1985). Because the ALJ chose to credit the opinion of the non-examining physician over the opinion of Dr. Dillon, the consultative psychologist, without reconciling the inconsistencies and without offering good cause or acknowledging the greater weight due Dr. Dillon in her capacity as an examining physician, this case must be remanded for further proceedings.

Additionally, the court concludes that the ALJ failed to develop the record regarding the severity of Thomas's self-mutilation and the effect of that impairment on his ability to perform work. The record is replete with references to Thomas' self-mutilation during periods of stress. (R. 37, 45, 258-59, 272, 321, 392, 401-05, 409, 411, 471, 481-82, 488 &

490).  Thomas testified about his difficulties with cutting and self-mutilation.  (R. 37-38, 45,

49).  There is sufficient evidence in the record from which the ALJ should have considered

the effects of this impairment on Thomas' ability to perform work.  Because the ALJ relied

strictly on Dr. Estock's assessment, he did not include this impairment in any of his

hypothetical questions to the vocational expert.  Of course, even if the ALJ concludes that

this condition itself is not a severe impairment, he must still consider each impairment

alleged by the plaintiff and determine whether the alleged impairments are sufficiently severe

- either singularly or in combination - to create a disability.  *See Gibson v. Heckler,* 779 F.2d

619, 623 (11th Cir. 1986).  All of the plaintiff's impairments must be considered in

combination, even when the impairments considered separately are not severe.  *Hudson*, 755

F.2d at 785.  After careful review of the record, the court concludes that the ALJ erred as

a matter of law in his consideration of the evidence in the record regarding the severity of

Thomas' mental impairments and the impact of his impairments on his ability to work.  Thus,

the court concludes that this case must be remanded to the Commissioner for further

proceedings consistent with this opinion.

## V.  Conclusion

    "Social Security proceedings are inquisitorial rather than adversarial.  It is the ALJ's

duty to investigate the facts and develop the arguments both for and against granting

benefits."  *Sims v. Apfel*, 530 U.S. 103, 110-111 (2000).  In this regard, the ALJ failed in his

duty to develop the record.

> The SSA is perhaps the best example of an agency that is not based to a significant extent on the judicial model of decisionmaking.  It has replaced normal adversary procedure with an investigatory model, where it is the duty of the ALJ to investigate the facts and develop the arguments both for and against granting benefits; review by the Appeals Council is similarly broad. *Id*.  The regulations also make the nature of the SSA proceedings quite clear. They expressly provide that the SSA "conducts the administrative review process in an informal, nonadversary manner."  20 C.F.R. § 404.900(b).

*Crawford & Co. v. Apfel*, 235 F.3d 1298, 1304 (11th Cir. 2000).

Thus, for the reasons as stated, the decision of the Commissioner will be reversed and this case remanded to the Commissioner for further proceedings consistent with this opinion.

A separate final judgment will be entered.

It is further

ORDERED that, in accordance with *Bergen v. Comm'r of Soc. Sec*., 454 F.3d 1273, 1278 fn. 2 (11th Cir. 2006), the plaintiff shall have **sixty (60)** days after he receives notice of any amount of past due benefits awarded to seek attorney's fees under 42 U.S.C. § 406(b). *See also Blitch v. Astrue*, 261 Fed. Appx. 241, 242 fn.1 (11th  Cir. 2008).

Done this 16th of March, 2016.


_____/s/Charles S. Coody_____
CHARLES S. COODY
UNITED STATES MAGISTRATE JUDGE